WARREN *v.* THE BALTIMORE TRANSIT COMPANY

[No. 16, September Term, 1959.]

*Decided October 19, 1959.*

The cause was argued before HENDERSON, HAMMOND, PRESCOTT and HORNEY, JJ.

*Donald L. Allewalt,* with whom was *James K. Cullen, Jr.,* on the brief, for appellant.

*Joseph Sherbow,* with whom were *Edward F. Shea, Jr., Norman Polovoy* and *Sherbow & Sherbow,* on the brief, for appellee.

HAMMOND, J., delivered the opinion of the Court.

Appellant, the holder of one hundred shares of the 5% preferred stock of The Baltimore Transit Company, dissented from the recapitalization of the company effected in 1953, whereby the accumulated dividend arrearages on his stock were eliminated, and duly demanded the fair value of his shares. The appeal is from the order of the equity court affirming the report of the appraisers who set a value on his stock which he felt was less than fair.

Prior to the recapitalization, there were outstanding 233,427 shares of the preferred stock of the par value of $100 a share and 169,142 shares of common stock. Common stockholders had one vote for each three shares; preferred stock had one vote per share. Dividends had not been paid on preferred or common stock since 1935, when the company emerged reorganized from the bankruptcy court. Unpaid arrearages on the preferred stock amounted to $77.50 a share. Such arrearages were to be liquidated by the application to them of 55% of any distributed surplus income for any fiscal year; the remaining 45% of such surplus was to be paid over to the common stockholders. In liquidation, holders of the preferred stock were to receive par value and, from surplus, all arrearages of accumulated dividends (as to surplus earned after 1935, they would receive 55%) before holders of the common stock were paid anything. It was specifically provided that a consolidation or merger of the company should not be deemed a liquidation.

The plan of reorganization was designed, first, to provide, partly out of capital surplus, an adequate reserve for depreciation of the depreciable rail property of the company (some $22,000,000 of rail property had been retired or abandoned since 1946, leaving the reserve for depreciation, required by order of the Public Service Commission, at only $460,780.45),

and, second, to provide a sound and realistic capital structure.[1] The new capital structure was arranged to reduce the par and liquidation value of the preferred stock from $100.00 a share to $50.00 a share, and to change the annual 5% cumulative dividend to a $2.50 non-cumulative dividend. Each share of old preferred was exchanged for one share of new preferred. The number of authorized shares of common stock was increased from 200,000 to 1,000,000 and each share of old preferred stock received three shares of new common, and each share of old common was exchanged for one share of new common. Thus, the common stockholders contributed to the preferred stockholders three-fourths of the residual equity of the company.

The appraisers appointed by the court held a hearing, considered the briefs submitted by each side, and filed a written report, in which they set the value of appellant's stock at $32.50 a share (the market value on January 26, 1953, the critical date), which they found to be its fair value "as of the close of business on the day of the stockholders' vote, * * * excluding any appreciation or depreciation directly or indirectly consequent upon such action or the proposal thereof," pursuant to the directions of the statute, then Code (1951), Art. 23, Sec. 69(a) (now Sec. 73(a)).

Appellant concedes that the company had the right under what is now Code (1957), Art. 23, Sec. 10, to reclassify or cancel existing preferred stock and to alter such contract rights as he had by virtue of the charter. He raised below only the question he presses here, that he was not given the fair value of his stock.

Appellant's real contention is that the controlling law required the appraisers to perform an artificial liquidation of the company so as to determine the net asset value of his stock, and that it was reversible error for them to have failed to do so. Before the appraisers appellant contended that the com-

1. To pay the arrearages on the preferred stock accrued as of July 1, 1952, in the amount of $17,507,025 would have required a payment of $14,323,930 to the common stockholders, or a total of $31,830,955—an amount in excess of the company's capital.

pany's balance sheet of December 31, 1952, showed an excess of assets over liabilities of some $47,000,000 and that the aggregate amount required to pay par value and accrued dividends on the preferred stock was but $41,000,000, so that the fair value of his stock was $177.50 a share. He now reads the balance sheet as showing assets, after the deduction of some $20,000,000 for the understatement of depreciation found by the consulting engineers of the company, as showing net assets of $20,000,000 or slightly over $85.00 for a preferred share. In each instance he seems to assume that book value and the amount that liquidation would produce are the same, an assumption the appraisers found entirely unwarranted.

Appellant bases his primary contention, first, on *American General Corp. v. Camp,* 171 Md. 629, 637-638, and, second, on the charter provisions reproduced on the stock certificate as to the right of the preferred stockholders to receive par and accrued dividends upon the liquidation of the company. The *American General* case equated a merger or consolidation of a corporation with its dissolution, and said that "The owner of shares of stock in a corporation whose legal existence is at an end would be entitled to receive the aliquot proportion which the number of shares held would be entitled to receive in the distribution of the net amount of the corporate funds in which his particular kind of stock would be entitled to share," and continued, after noting that every appraisal presented its own particular problem, that "Since in mergers or consolidations there is generally a transfer of corporate assets of the consolidated or merged corporation, without sale or conversion but in kind and in specie, the assets are not in the form of money but unconverted, and therefore an artificial liquidation must be made in order to ascertain by this procedure the net asset value of the stock as accurately as the problem admits."

We find neither of appellant's grounds to be sound. In the years that have passed since appraisal statutes first came into the law (the Maryland statute passed in 1908 was one of the first), the rules governing the rights of dissenting stockholders have crystallized and are relatively uniform throughout the country. Whether the statute calls for the

payment of value, fair value, or fair cash value, makes little difference since the terms are considered synonymous. *Burke v. Fidelity Trust Co., 202* Md. 178, 186. The real objective is to ascertain the actual worth of that which the dissenter loses because of his unwillingness to go along with the controlling stockholders, that is, to indemnify him. The textwriters and cases agree generally that this is to be determined by assuming that the corporation will continue as a going concern—not that it is being liquidated—and on this assumption by appraising all material factors and elements that affect value, giving to each the weight indicated by the circumstances, including the nature of the business and its operations, its assets and liabilities, its earning capacity, the investment value of its stock, the market value of the stock, the price of stocks of like character, the size of the surplus, the amount and regularity of dividends, future prospects of the industry and of the company, and good will, if any.[2]

Their extensive experience has led those corporate and financial sophisticates, Delaware and New York, to the same conclusions. Delaware has explicitly and emphatically rejected the liquidation theory test, saying that dissenting stock must be valued as a proportionate interest in a going concern and by consideration of all relevant factors, such as market value, asset value, dividends, earnings prospects and other

---

**2.** Bonbright, *The Valuation of Property,* (1st Ed., 1937), Ch. XXIV; 13 Fletcher, *Cyclopedia of the Law of Private Corporations,* Sec. 5899 (perm. ed.); 13 Am. Jur. *Corporations,* Sec. 1232 (1938); *Appraisal of Shares of Dissenting Stockholders in Consolidations,* 1 Md. L. Rev. 338; Lattin, *Remedies of Dissenting Stockholders under Appraisal Statutes,* 45 Harv. L. Rev. 233; Robinson, *Dissenting Shareholders: Their Right to Dividends and the Valuation of Their Shares,* 32 Colum. L. Rev. 60; Zabriskie, *Appraisal Statutes — An Analysis of Modern Trends,* 38 Va. L. Rev. 915; *Matter of Fulton,* 257 N. Y. 487, 178 N. E. 766; *Phelps v. Watson-Stillman Co.* (Mo.), 293 S. W. 2d 429, 432-433; *Robbins v. Beatty* (Iowa), 67 N. W. 2d 12, 18; *Republic Finance & Investment Co. v. Fenstermaker* (Ind.), 6 N. E. 2d 541; *Adams v. United States Distributing Corp.* (Va.), 34 S. E. 2d 244, cert. den. 327 U. S. 788, 66 S. Ct. 807, 90 L. Ed. 1014; Annotations 95 A. L. R. 922; 38 A. L. R. 2d 442.

pertinent facts.[3] The New York cases say also that an appraisal is not a liquidation and that all factors affecting going concern value must be considered, although New York tends to follow market value, if the stock is listed and active, to the degree that it truly and fairly reflects the judgment of informed buyers and sellers.[4]

We think the language of the *American General* case, relied on by the appellant, must be read in the context of the opinion as a whole and limited in its applicability to the facts of the case there decided. The companies involved were investment trusts, the assets of which consisted of cash and bonds and stocks easily convertible into cash. The value of these assets could be quickly and easily obtained and appraised. The expert appraisers found that the market value of the preferred stocks of the investment companies were low and rejected them because the stocks were not listed, transactions were few, and there then prevailed a lack of public confidence in investment trusts. The appraisers further found that earnings and dividends did not afford a true measure of the value of the stock, and selected net asset value. The court affirmed the appraisal.

In determining the effect of the decision, it is important to note that the Court said (p. 637) : "Every appraisal would as a rule be a particular problem which would vary with the kind of corporation, the nature, extent, and methods of its operations, the state of its assets, the form and incidence of its liabilities, and with many other circumstances too numerous to admit of a general classification. These general remarks are to direct attention to the manifold possibilities and difficulties of the problem, and the impracticability of the statement of any rule of uniform application as to the factors of fair value." The opinion then pointed out that the findings of the appraisal must be given great weight and that the

---

**3.** *Tri-Continental Corporation v. Battye,* 74 A. 2d 71; *Heller v. Munsingwear, Inc.,* 98 A. 2d 774; *Sporborg v. City Specialty Stores,* 123 A. 2d 121.

**4.** *Matter of Fulton,* note 2; *Application of Behrens,* 61 N. Y. S. 2d 179, aff'd 69 N. Y. S. 2d 910; *Application of Marcus,* 79 N. Y. S. 2d 76; *In re Karlin,* 111 N. Y. S. 2d 96.

award would not be disturbed except for some material and prejudicial error of law. It is apparent, therefore, that the Court in the *American General* case was saying that under the facts before it there was no error of law or fact in the finding of the appraisers that net asset value of the investment trusts they were concerned with was the best measure of fair value of their shares and not that an artificial liquidation to determine net asset value must be used in every case. Parenthetically, it is apparent on reflection that where the appraisal is of the shares of a corporation the assets of which consist of bonds and stocks, an artificial liquidation is a finding of market value by indirection, albeit not of the stock itself but by making the value of that stock the total equivalent of the market value of the securities which it owns.

*Petry v. Harwood Electric Co.* (Pa.), 124 A. 302, on which appellant also relies strongly, is clearly distinguishable. The suit there was to enjoin a merger or, in the alternative, to determine the value of the dissenter's stock. The court found that the merger was the legal equivalent of a dissolution, that the majority stockholders had diverted assets which were applicable to the preferred shares and that the market price of the stock had been depressed by the controlling stockholders.

Appellant's argument that his contract rights in liquidation give his preferred stock the fair value equal to the sum of par plus accrued dividends, fails on both factual and legal grounds. Factually, the charter and stock certificate expressly state that a consolidation or merger is not to be considered a liquidation, and if a consolidation or merger was not to be deemed a liquidation, certainly the readjustment of the capital structure of the company could not be considered in that category. Legally, as we have seen, most courts do not treat consolidations, mergers or capital readjustments as liquidations, and we hold that for the purposes of an appraisal of dissenting stock they need not be so considered. This being so, the appellant's preferred stock is to be valued as an interest in a continuing enterprise with whatever benefits and liabilities as to value its preferred status affords it. Cases, among others, which so hold include *Matter of Fulton*

(N.Y.), 178 N. E. 766; *Application of Behrens,* 61 N.Y.S. 2d 179, aff'd 69 N.Y.S. 2d 910; *Jacques Coe & Co. v. Minneapolis-Moline Co.* (Del.), 75 A. 2d 244; and *Republic Finance & Investment Co. v. Fenstermaker* (Ind.), 6 N. E. 2d 541.

That the role of the courts in an appraisal proceeding is limited and that they must give great weight to the findings of the appraisers has often been reiterated and acted upon. The language of the *American General* case, speaking of the appraisers, that "The presumption is that their award is correct, and effect will be given to their determination unless it appear by clear and satisfactory evidence that the award was, by reason of some material and prejudicial error of law, in conduct or of fact, not the fair value of the stock * * *" was quoted with approval in *Burke v. Fidelity Trust Co.,* 202 Md. 178, 186, cited above. It is judicial recognition to some extent of the recommendation that "The questions involved are rather economic than legal in character. * * * Such standards can better be derived by consulting the business man, the banker, and the industrial engineer, than the jurist, legal scholar, or lawyer." [5]

The appraisers in the case at bar were well known experienced experts in valuing corporate securities. They considered and discarded book value, finding it to be without significant weight. They believed that liquidation would produce no value for the preferred. They considered earnings over a long period, estimated that they averaged less than a dollar a share a year and found they would justify a fair value for the dissenting stock of from $10 to $15 a share. They found that the business of the company had been steadily declining over the years at a rate which had not been offset by fare increases. They found the declining trend of the mass urban transit business to be responsible for the low value and low market price of the company's stocks in relation to book values. They considered the low sales price of a comparable company in a nearby city. Implicitly they found no good will.

---

5. Lattin, *Remedies under Appraisal Statutes,* 45 Harv. L. Rev. 233, 270, cited in note 2.

The appraisers did not, as appellant contends, assume that fair value was to be determined on a salvage rather than a going concern basis. They treated the company as a continuing enterprise and found that "From the security analyst's standpoint, the earnings record and the capital structure of Baltimore Transit are impelling reasons for appraising the preferred stock as an equity rather than a senior security." Finally, they found that over the period from October, 1952 to January, 1953, on the Philadelphia-Baltimore Stock Exchange, the range of prices and the volume of trading made market value "an excellent criterion of value since the price reflects all of the relevant factors." The appellant has not shown that, on the facts before them, those experienced experts were wrong in fact or in law. Having considered the relevant factors bearing on fair value, they were not obliged to average them; rather, they could give such weight to one or more as they determined the facts indicated.

The principle is like that recognized in *Seaboard Commercial Corporation v. State Tax Commission,* 181 Md. 234, 243, where the commission was directed by statute to determine the value of stock for tax purposes from a consideration of market value, net earnings and net value of assets. The Court said: "It would clearly be error for the Commission not to consider all of these factors, but that does not mean that an average must be struck between them. The Commission is set up as a body of experts on taxation, and it is intended that its judgment in the absence of clear error should be final on the assessments it makes. It may in one case hold that a combination of all three factors should be used to reach a fair assessment. It may in one case give the market value the chief weight. It may in another rely chiefly on the net earnings, and in another it may base its assessment on the net value of the assets. In each of the four suggested decisions, it may be entirely correct, although each is based upon a different point of view. That is the purpose of the statute, to enable a body of men, selected to investigate such matters, to determine in each case what a fair assessment is, * * *"

Appellant makes a final and subsidiary contention that the appraisers were not sworn as the statute directs and that,

therefore, the appraisal is void. This point was first raised in a memorandum of law given the trial judge after the hearing before him by present counsel for·appellant, who entered the case two years after the report of the appraisers was filed. It does not appear from the record that the appraisers were not sworn. It is not to be presumed that they acted irregularly or in violation of the statutory prescription. The presumption is the other way. *Union Trust Co. v. State,* 116 Md. 368, 372; 20 Am. Jur. *Evidence,* Sec. 168.

*Order affirmed, with costs.*